BS: CLS/BY/BG

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | <u>INFORMATION</u> |
| - against - | Cr. No. 18-30 (NGG)<br>(T. 18, U.S.C. §§ 1343, 2 and 3551 <u>et</u> <u>seq</u>.) |
| HSBC HOLDINGS PLC, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE CHIEF OF THE FRAUD SECTION OF THE DEPARTMENT OF JUSTICE, CRIMINAL DIVISION, CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Information, unless otherwise indicated:

I.  <u>The Defendant and the Relevant Entities</u>

1.  HSBC Holdings plc, including its numerous subsidiaries and affiliates, (collectively "HSBC") was one of the largest banking and financial services institutions in the world, with operations in the Europe, Middle East, and Africa ("EMEA"), Asia-Pacific, and the Americas. HSBC operated a global foreign exchange ("FX") cash trading business. HSBC's three principal FX trading desks were located in New York, London and Hong Kong.

2.  Prior to 2011, HSBC provided financial services to Cairn Energy plc ("Cairn"), an oil and gas exploration company. In December 2011, HSBC executed an FX transaction for Cairn in which it converted approximately 3.5 billion U.S. Dollars to British Pounds (the "Cairn FX Transaction").

3. Prior to 2010, HSBC provided financial services to Victim Company 2, a financial services company. In March 2010, HSBC executed an FX transaction for Victim Company 2, as part of which it converted approximately £5.3 billion British Pounds to U.S. Dollars (the "Victim Company 2 FX Transaction").

II. Relevant Definitions

4. The "FX market" enabled participants to buy, sell, exchange and speculate on currencies. Participants in the FX market included financial institutions, central banks, hedge funds, investment management firms and corporations.

5. An "FX spot transaction" (sometimes referred to as an "FX transaction") involved the exchange of a given amount of one currency, such as the U.S. Dollar ("USD" or "Dollar"), for the equivalent amount of another currency, such as the British Pound ("GBP" or "Sterling"), at an agreed upon price.

6. A "currency pair" was the relation of two currencies to each other. The first currency of a currency pair was called the "base" currency, and the second currency was called the "quote" currency. For example, one currency pair was GBP/USD, or Sterling/Dollar (also referred to as "cable"). In this pair, GBP was the base currency and USD was the quote currency. An order to buy GBP/USD was an order to buy the base currency (GBP) using the quote currency (USD) to pay for the transaction. An order to sell GBP/USD was an order to sell the base currency (GBP) and to receive the quote currency (USD). For example, GBP/USD 1.5620 meant that one Pound Sterling could be exchanged for 1.5620 Dollars.

7. "Fixes" were benchmark exchange rates. WM/Reuters ("WMR"), a financial services company, published hourly "fix" rates for various currencies. The WMR fix at 4:00 PM London time (the "4 PM fix") was one of the most widely used fixes in the world.

8. "P-books" was a phrase used by HSBC personnel to refer to internal HSBC accounts allocated to individual HSBC traders that allowed those traders to trade in any currency pair. Revenues generated in P-books accrued to the benefit of HSBC and were taken into account for purposes of evaluating each trader's performance, promotion potential and compensation.

III. <u>The Cairn Energy Fraudulent Scheme</u>

9. From at least in or about October 2011 and continuing until at least in or about December 2011, HSBC, together with others, participated in a scheme to defraud Cairn by:

    a. Using information provided in confidence to HSBC by Cairn (namely, the details of the Cairn FX Transaction) to purchase Sterling in advance of the transaction, knowing that the transaction would cause the price of Sterling to increase, thereby generating substantial trading profits for HSBC (a scheme that is commonly referred to as "front-running") in breach of HSBC's duty of trust and confidence to Cairn;

    b. Causing the Cairn FX Transaction to be executed in a manner designed to cause the price of Sterling to spike (commonly referred to as "ramping") to the benefit of HSBC, and at the expense of Cairn, despite HSBC's representations to execute the transaction in the best interests of, and to avoid adverse market impact to, Cairn; and

    c. Making, and causing to be made, material misrepresentations and omissions to Cairn to further the scheme by, among other things, concealing HSBC's role in the spike in the price of Sterling.

A. <u>The Bidding Process</u>

10. In approximately 2010, Cairn entered into an agreement with another company to sell part of its ownership interest in an Indian subsidiary for approximately $3.5

billion. Execution of the sale was dependent upon regulatory approval in India. If the sale was approved, Cairn planned to convert approximately $3.5 billion in sale proceeds into Sterling, which it then intended to distribute to its shareholders. In approximately 2011, Cairn, assisted by an advisory group (the "Advisor"), asked approximately ten banks, including HSBC, to bid on the right to execute the Cairn FX Transaction.

11. Prior to providing the banks with the details of the Cairn FX Transaction in a Request for Proposal ("RFP"), Cairn and the Advisor required the banks to enter into a confidentiality agreement that protected Cairn's confidential information relating to the Cairn FX Transaction. In the confidentiality agreement HSBC executed, HSBC agreed to "keep the Confidential Information strictly confidential and not to disclose, sell, trade, publish or otherwise dispose of such Confidential Information . . . or discuss the same with, any third party, other than such duly authorised employees, officers and directors of [HSBC], as are strictly necessary to evaluate the Confidential Information." "Confidential Information" was defined to include "commercial, contractual, corporate and financial information" provided by Cairn and specifically included the RFP information.

12. HSBC further agreed to "use the Confidential Information solely for the purposes for which it is provided, details of which are set out in the RFP." After the confidentiality agreement was fully executed, Cairn and the Advisor provided HSBC with the RFP, which contained Confidential Information about the Cairn FX Transaction.

13. The RFP provided in relevant part that:

> The RFP contains confidential information and has been delivered to relationship banks for information only and on the express understanding that (a) they shall keep the information included in the RFP confidential (except to the extent that such information is in the public domain), and (b) use it only for the purpose set out below. Save as specifically agreed in writing by [Cairn], the RFP

4

must not be copied, reproduced, disclosed, distributed or passed, in whole or in part, to any other person.

The purpose of the RFP is to assist the relationship banks in their analysis of the proposed currency exchange transaction. The RFP should not be used for any other purpose without the prior written consent of [Cairn].

14. Employees of HSBC who were given access to the Confidential Information were made "insiders" by HSBC to the Cairn FX Transaction. In or about October 2011, Mark Johnson, the head of global FX cash trading at HSBC, became an "insider" to the Cairn FX Transaction. In or about November 2011, Stuart Scott, the head of HSBC's FX cash trading for EMEA also became an "insider" to the Cairn FX Transaction. As "insiders," Johnson and Scott knew they had an obligation not to misuse the Confidential Information, including by front-running.

15. After receiving the RFP, HSBC employees sought to win the bid for the Cairn FX Transaction. HSBC's pitch materials listed Mark Johnson as a member of the HSBC team for the transaction, along with the head of corporate structuring for EMEA at that time ("Salesperson 1").

16. In the pitch materials, HSBC employees made representations to Cairn and the Advisor about confidentiality and HSBC's ability to execute the Cairn FX Transaction at the best possible price and with the lowest possible risk of financial loss for Cairn. For example, the written HSBC pitch presentation stated:

    a. "Time to execute is essentially a choice for the company, as HSBC is able to provide one quote for the full amount or even drip feed the market in utmost confidential nature so as to ensure there are no sudden FX moves against the company;"

    b. "HSBC would work with you to ensure best execution [of the Cairn FX Transaction] during the day"; and

5

    c. "[I]t is in the interest of the company to manage the process jointly with HSBC in case of undue market volatility. We would like to execute this in the best interest of the company . . . ."

  B. <u>HSBC Selected to Handle the Cairn FX Transaction</u>

    17. On or about October 18, 2011, Cairn, through its Advisor, notified HSBC that it had been selected to handle the Cairn FX Transaction "because they are the best and [had] acknowledged that they now have the pressure to deliver best execution."

    18. Despite knowing that it had represented to Cairn that it would execute the transaction in a manner consistent with Cairn's best interests and keep the Cairn FX Transaction confidential, and in breach of HSBC's duty of trust and confidence to Cairn, HSBC devised a scheme to benefit itself at Cairn's expense by (a) using its insider knowledge of the details of the Cairn FX Transaction to front-run that transaction, and (b) ramping the price of Sterling/Dollar to the benefit of HSBC, and to the detriment of Cairn.

    19. In a telephone call with Cairn and the Advisor on or about November 28, 2011, Mark Johnson and Stuart Scott were notified that the Cairn FX Transaction might occur soon.

    20. On that same day, on or about November 28, 2011, in preparation for a call among Cairn, the Advisor and HSBC employees, Salesperson 1 gave advice about ramping the market in a manner that would not raise suspicions of Cairn or the Advisor. Salesperson 1 stated to Stuart Scott during a telephone call that, among other things, Cairn viewed the Advisor "as an agent in between who will be closely monitoring it when we are doing [the Cairn FX Transaction], . . . . So we don't want . . . to push the market too much high[er] . . . and at the same time we do want to make money on this."

6

21.     On or about November 30, 2011, Mark Johnson made a purchase of Sterling in exchange for Euros, which was booked in his P-book. Johnson held the Sterling he purchased until the day of the Cairn FX Transaction, when he sold the currency for a profit to HSBC.

22.     On or about December 5, 2011, Mark Johnson and Stuart Scott received additional information regarding the timing of the Cairn FX Transaction. Specifically, a news article was circulated to them reporting that the underlying sale by Cairn of its Indian subsidiary had received regulatory approval.

23.     On that same day, on or about December 5, 2011, Mark Johnson traveled to New York. While in New York, Johnson directed an FX trader in HSBC's New York office to purchase Sterling in exchange for Dollars, which Johnson later sold for a profit to HSBC on the day of the Cairn FX Transaction. The next day, on or about December 6, 2011, Stuart Scott purchased Sterling in exchange for Euros, which Scott later sold for a profit to HSBC on the day of the Cairn FX Transaction.

C.     The Execution of the Cairn FX Transaction

24.     On or about December 7, 2011, Cairn contacted HSBC about executing the Cairn FX Transaction on that day. Salesperson 1 arranged for a call at approximately 1:35 PM London time between Cairn, the Advisor, Salesperson 1 and Mark Johnson and Stuart Scott to discuss whether the Cairn FX Transaction should be executed at the 3 PM fix or the 4 PM fix. HSBC knew that it was advantageous to it, and disadvantageous to Cairn, to execute the Cairn FX Transaction at the 3 PM fix because there was less liquidity at the 3 PM fix and currency prices at that earlier time were easier to manipulate than prices at the 4 PM fix.

25. During the December 7, 2011 call, Stuart Scott falsely and fraudulently suggested to Cairn that the 3 PM fix had more liquidity than the 4 PM fix. When confronted by the Advisor about that assertion, Scott falsely and fraudulently stated that the fixes were the same in terms of liquidity. Scott then stated there was more trading volatility at the 4 PM fix and Mark Johnson stated that he "personally would recommend" the 3 PM fix "so there's an element of surprise." Scott further stated that: "That's an excellent point actually, yeah. Because people do look for that, for the significant flows to happen at 4 o'clock and once they get a smell of that or a smell of significant flow going through, they will try to jump in front and start to muck around in the markets." Cairn followed the HSBC recommendation to execute the Cairn FX Transaction at the 3 PM fix.

26. Mark Johnson and Stuart Scott, anticipating that the execution of the Cairn FX Transaction by HSBC would drive up the price of Sterling/Dollar, quickly orchestrated front-running purchases of Sterling for HSBC. Specifically, within minutes of the December 7, 2011 telephone call with Cairn, Scott directed the purchasing of Sterling/Dollar in his P-book. Johnson and Scott also caused other FX traders at HSBC in both London and New York to purchase Sterling prior to the Cairn FX Transaction in their P-books.

27. On or about December 7, 2011, Cairn placed its order with HSBC to buy approximately 2.25 billion Sterling (equivalent to selling approximately $3.5 billion) in two tranches prior to the 3 PM fix—at approximately 1:51 PM and 2:28 PM London time. Johnson and Scott were in communication with each other concerning the execution of the Cairn FX Transaction. For example, during a consensually recorded telephone call at approximately 2:27 PM London time, Johnson commented to Scott, "Seems that they're starting to bite," in reference to Cairn's orders. In response, Scott stated, "full amount" (indicating that Cairn had authorized

8

the full order of 2.25 billion Sterling). Johnson then responded, "No, you're kidding?" Scott then re-confirmed that Cairn had indeed authorized the full purchase, to which Johnson replied: "Ohhhh, f***ing Christmas."

28.     During a consensually recorded telephone call at approximately 2:54 PM London time, Mark Johnson and Stuart Scott discussed the Cairn FX Transaction again. During that call, Johnson and Scott discussed how high they could "ramp" the price of Sterling/Dollar before Cairn would "squeal." Scott also provided a trader ("Trader 1") with guidance about how high to push the price of Sterling/Dollar prior to the 3 PM fix, when the Cairn FX Transaction would be priced. HSBC "ramped" the price Sterling/Dollar by aggressively trading before and during the fix in a manner designed to increase the price of Sterling/Dollar. As a result, the price of Sterling/Dollar spiked around the 3 PM fix. Indeed, in the 30 seconds before and 30 seconds after 3:00 PM London time, the price of Sterling/Dollar reached a market high for the day, allowing Johnson, Scott, and other FX traders at HSBC to generate significant profits in their P-books from their prior Sterling purchases by selling that Sterling at the higher prices generated by HSBC. HSBC did not disclose Johnson or Scott's P-book trades or the P-book trades of other FX traders at HSBC in Sterling to Cairn.

29.     On or about December 7, 2011, Cairn and the Advisor monitored the price of Sterling in the FX market in anticipation of the Cairn FX Transaction. When Cairn and the Advisor observed upward movement in the price of Sterling between 2:00 PM and 3:00 PM London time, they questioned Salesperson 1 about these price movements. At approximately 2:45 PM London time, Salesperson 1 told Mark Johnson and Stuart Scott that Cairn and the Advisor were calling at "every uptick" in reference to the price of Sterling. Finally, just after 3:00 PM London time, Salesperson 1 told Johnson and Scott that he had told Cairn and the

9

Advisor that a "[R]ussian name" was buying at the same time as Cairn. Accordingly, Johnson and Scott knew that Cairn and the Advisor had been falsely and fraudulently assured that the upward price movement in Sterling/Dollar was attributable to a "[R]ussian name."

30. Soon after 3:00 PM London time on or about December 7, 2011, Mark Johnson and Stuart Scott, together with others from HSBC, discussed the Cairn FX Transaction with Cairn and the Advisor. Johnson and Scott, among others, made and caused to be made misrepresentations to Cairn and the Advisor to conceal HSBC's misconduct with respect to, among other things, the cause of the upward price movement in Sterling/Dollar prior to the 3 PM fix and the timing and manner in which HSBC handled the Cairn FX Transaction.

31. For example, Stuart Scott represented to Cairn and the Advisor that the Cairn FX Transaction went "okay" despite an "initial jump" in the price, which he falsely and fraudulently attributed to trading by a Russian bank, in reference to the "[R]ussian name" that Salesperson 1 had previously discussed with Cairn and the Advisor. Contrary to Scott's representation and as Scott well knew, HSBC was responsible for the increase in the price of Sterling/Dollar prior to the Cairn FX Transaction, not a Russian bank.

32. Additionally, Stuart Scott falsely and fraudulently stated to Cairn and the Advisor that HSBC began "taking action" in the FX market approximately five minutes prior to the 3 PM fix. Contrary to Scott's assertion, and as Scott well knew, HSBC had purposefully been exerting upward pressure through its transactions in the Sterling/Dollar market well prior to 2:55 PM London time.

33. In the days immediately following this discussion, Cairn undertook to settle the Cairn FX Transaction with HSBC, during which process wires sent in furtherance of the scheme were transmitted from the Eastern District of New York to outside the State of New

York. Specifically, Cairn settled the Cairn FX Transaction by transferring U.S. dollars through a U.S. financial institution ("Financial Institution A") to HSBC. Financial Institution A only accepted and released these funds to HSBC following customary checks and approvals by personnel in Financial Institution A's offices in Brooklyn, New York. Financial Institution A personnel performed these checks and obtained the requisite approvals from Brooklyn by electronically accessing Financial Institution A's mainframe, which was located outside the State of New York. Each check and approval occurred through an interstate wire communication between Brooklyn, where Financial Institution A personnel were located at the time, and Financial Institution A's mainframe, which was located outside the State of New York.

34. In total, HSBC gained approximately $5,000,000 from its execution of the Cairn FX Transaction and approximately $3,000,000 from the P-book trades of the London and New York FX traders.

IV. The Victim Company 2 Fraudulent Scheme

35. From at least in or about February 2010 and continuing until at least in or about March 2010, defendant HSBC, together with others, participated in a scheme to defraud Victim Company 2 by:

a. Using information provided in confidence to HSBC by Victim Company 2 (namely, the details of the Victim Company 2 FX Transaction) to sell Sterling in advance of the transaction, knowing that the transaction would cause the price of Sterling to decrease, thereby generating substantial trading profits for HSBC (a scheme that is commonly referred to as "front-running") in breach of HSBC's duty of trust and confidence to Victim Company 2; and

b. Causing the Victim Company 2 FX Transaction to be executed in a manner designed to cause the price of Sterling to fall, to the benefit of HSBC, and to the

11

detriment of Victim Company 2, in breach of HSBC's duty of trust and confidence to Victim Company 2.

36.  In early 2010, Victim Company 2 planned to acquire the Asian business unit of another financial services company. To satisfy the terms and conditions of the proposed deal, it needed to acquire a significant amount of U.S. Dollars. As Victim Company 2's balance sheet was denominated in British Pounds, it planned to sell British Pounds to purchase the U.S. Dollars.

37.  HSBC employees provided recommendations to Victim Company 2 about how to structure and execute its FX transaction, and pitched its FX trading capabilities to Victim Company 2. In connection with those discussions, Victim Company 2 and HSBC employees, on behalf of HSBC, entered into a confidentiality agreement that governed all information relating directly or indirectly to the proposed transaction. Under this agreement, HSBC agreed to keep all such information "secret and confidential," to not disclose such confidential information, and to not use any confidential information "for any purpose (including but not limited to, any competitive or commercial purpose)" other than in connection with the proposed transaction. Accordingly, HSBC and certain of its employees knew that HSBC had an obligation not to misuse Victim Company 2's confidential information.

38.  On February 24, 2010, HSBC employees made their initial "pitch" presentation to Victim Company 2 concerning the FX transaction. The following day, an HSBC employee e-mailed Victim Company 2 proposing a call with HSBC's global head of foreign exchange (the "Global FX Head") to provide greater precision on the levels of liquidity and pricing to which HSBC could commit. In that e-mail, the HSBC employee represented that HSBC's Global FX Head "was already an insider on this trade and bound to confidentiality."

39. The next day, Friday, February 26, 2010, the Global FX Head approached the head of HSBC's London FX spot desk (the "London Spot FX Head") for information relevant to the Victim Company 2 FX transaction. The Global FX Head asked him for pricing information and an assessment of liquidity for spot FX transactions in GBP/USD of various large sizes, such as $1B, $3B, and $5B. During this conversation, the Global FX Head further told the London Spot FX Head that HSBC would be selling, rather than buying, cable in this transaction. This indicated to the London Spot FX Head that a client had provided information to HSBC in confidence about a large FX transaction that it may execute with HSBC in the near future.

40. The London Spot FX Head, having learned that HSBC would likely be selling a large amount of cable, and despite knowing that this information was confidential, perpetrated a scheme to defraud Victim Company 2 by misappropriating this confidential information for his own benefit and that of the bank in violation of the duty of trust and confidence that HSBC owed to Victim Company 2. Specifically, HSBC's London Spot FX Head, based on the confidential information of Victim Company 2 (that is, based on the fact that Victim Company 2 was to sell cable in the immediate future): (a) traded ahead of, or "frontran," Victim Company 2 by placing proprietary trades in advance of the client with the expectation that HSBC's trading for Victim Company 2 would depress the price of cable in a manner that benefitted any "short" positions taken by HSBC; and (b) executed the Victim Company 2 FX Transaction in a manner designed to cause the price of Sterling to fall, thereby causing Victim Company 2 to transact at less favorable prices and allowing HSBC's London Spot FX Head to cover his short positions and to make money.

41. During the afternoon of February 26, 2010, the London Spot FX Head sent an international wire communication from London, England to the Southern District of New

13

York in the form of a Bloomberg chat message to an HSBC trader in New York requesting that he sell 25M GBP/USD on his behalf and to put it on the "overnight sheet." The London Spot FX Head received this currency in his P-Book on Monday morning, March 1, 2010.

42. Then over the weekend of February 27 and 28, 2010, the media reported the news of Victim Company 2's potential acquisition. Over the course of the weekend, Victim Company 2 decided to move forward with its FX transaction, and it informed HSBC that it would be executing the FX transaction on Monday, March 1, 2010. On Sunday, February 28, 2010, the Global FX Head contacted the London Spot FX Head to request that he be at the trading desk early on Monday morning.

43. On Monday morning, March 1, 2010, the Global FX Head instructed the London Spot FX Head to take over HSBC's cable franchise trading book from HSBC's regular cable trader in order to execute the Victim Company 2 FX Transaction. Before executing the FX Transaction, however, the London Spot FX Head continued to front-run the transaction by establishing short cable positions in his P-Book. Between approximately 5:45 a.m. and 8:09 a.m., the London Spot FX Head established a short position of approximately £95M GBP/USD in his proprietary trading book. This included the approximately £25M that the London Spot FX Head received from HSBC New York, as well as approximately £20M that the London Spot FX Head sold to HSBC Hong Kong, and approximately £50M that the London Spot FX Head sold to third parties from his proprietary trading book.

44. At approximately 10 a.m. on March 1, 2010, the Victim Company 2's Board of Directors approved the deal to acquire the Asian business unit, and shortly thereafter, Victim Company 2 agreed to execute its FX transaction with HSBC. HSBC executed the transaction using several types of financial instruments, including an option and forward. As

part of the transaction, HSBC sold approximately £5.3 Billion GBP/USD in the spot FX market in its GBP/USD franchise book. Victim Company 2 and HSBC agreed that HSBC would execute the Victim Company 2 FX transaction based on a "no-worse-than" price. HSBC would sell the cable in the foreign exchange market, and if it was able to achieve a price that was better (higher) for Victim Company 2, it would offer Victim Company 2 a price improvement. Specifically with respect to price, HSBC stated to Victim Company 2 that, "[a]s agreed, these are 'no-worse-than' prices. Should we be in a position to improve, we will revert."

45.     As HSBC began to execute the transaction shortly after 10 a.m., the price of cable began to decrease. It did not, however, decrease as far as the lower "no-worse-than" price that it had quoted to Victim Company 2. In order to justify that lower price, and to further increase the value of HSBC's front-running positions that he had previously established that benefitted from a lower price of cable, the London Spot FX Head traded in a manner consistent with an intent to drive down the price of cable even further. As a result of HSBC's trading, the GBP/USD price reached a low for the day at approximately 11:40 A.M. The London Spot FX Head closed out his P-Book positions shortly thereafter, at approximately 11:52 A.M, benefitting from the low price and making a profit for HSBC of approximately $3.6 million. HSBC did not disclose the London Spot FX Head's P-Book trades to Victim Company 2.

46.     HSBC also made a significant profit from its execution of the Victim Company 2 FX Transaction. By trading in a manner consistent with an intent to drive down the price of cable, HSBC profited by selling high and then "buying low" when it transacted with Victim Company 2 based on the low "no-worse-than" price. Before settling the transaction, HSBC gave Victim Company 2 a price improvement. Even with that price improvement, HSBC

15

made a profit of approximately $34.8 million on its execution of the Victim Company 2 FX Transaction.

COUNT ONE
(Wire Fraud)

47.     The allegations set forth in paragraphs one through thirty-four are realleged and incorporated as though fully set forth in this paragraph.

48.     In or about and between October 2011 and December 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC, together with others, did knowingly and intentionally devise a scheme and artifice to defraud Cairn, and to obtain money and property from Cairn by means of materially false and fraudulent pretenses, representations and promises.

49.     On or about the dates specified below, for the purpose of executing such scheme and artifice, the defendant HSBC, together with others, transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| Count | District | On or About Date | Underlying Fund Transfer | Description of Wire |
|---|---|---|---|---|
| ONE | EDNY | 12/8/2011 | Outgoing fund transfer of approximately $286.5 million from Cairn's Financial Institution A account to HSBC. | Wire initiated by Financial Institution A from Brooklyn, New York, to Financial Institution A's mainframe outside the State of New York approving underlying fund transfer. |

(Title 18, United States Code, Section 1343, 2 and 3551 et seq.)

## COUNT TWO
(Wire Fraud)

50. The allegations set forth in paragraphs one through eight and thirty-five through forty-six are realleged and incorporated as though fully set forth in this paragraph.

51. In or about and between February 2010 and March 2010, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendant HSBC, together with others, did knowingly and intentionally devise a scheme and artifice to defraud Victim Company 2, and to obtain money and property from Victim Company 2 by means of materially false and fraudulent pretenses, representations and promises.

52. On or about the dates specified below, for the purpose of executing such scheme and artifice, the defendant HSBC, together with others, transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| Count | District | On or About Date | Underlying Fund Transfer | Description of Wire |
|---|---|---|---|---|
| TWO | SDNY | 2/26/2010 | N/A | Electronic chat communication at approximately 4:47 p.m. London time involving an HSBC trader in New York, New York and the London Spot FX Head outside the State of New York in which the London Spot FX Head requested that the HSBC trader sell 25M GBP/USD on his behalf. |

(Title 18, United States Code, Section 1343, 2 and 3551 et seq.)

SANDRA L. MOSER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

By: _____
Benjamin D. Singer, Chief
Securities and Financial Fraud Unit
Carol Sipperly, Assistant Chief
Brian Young, Assistant Chief
Blake Goebel, Trial Attorney